By the will of Otto Arens, who died March 26th, 1910, his residuary estate was left to trustees, the income to be paid to his widow for life; at her death one-half the corpus was to be paid to a son Siegfried, and the income from the other half paid to a daughter, Mrs. Hagedorn, for life; at her death that half of principal is to be paid to her issue, if any, otherwise to the son Siegfried, if living, or if he be then dead, to his issue.
The widow died November 25th, 1920. The daughter is living; she has no children. The son is living and has two minor children. The trustees ask the instructions and direction of the court as to the distribution to be made by them under the will, the questions being as to the apportionment of dividends on securities held in the corpus of the trust estate. They have also filed their accounts for settlement in this court, and except to the disallowance (by the master to whom the accounts were referred) of two items for which they prayed allowance.
The original trust estate included certain corporate stocks. On these stocks, stock dividends have been declared subsequent
to the death of the widow — the first life tenant. Are these stock dividends income, or capital, or partly each? If they are part income and part capital, in what proportion is the apportionment to be made? If they are in part or wholly income, is such income to be apportioned between the estate of the widow and the subsequent beneficiaries — and if so, in what proportions? *Page 379 
These are the questions arising on the main branch of the case.
It has been expressly determined by our court of errors and appeals that a stock dividend is partly capital and partly income; that such portion of the stock dividend as represents earnings to which the life tenant (in the case of a trust such as the one now sub judice) would be entitled if such earnings had been distributed as an ordinary dividend, is to go to such life tenant, and the balance which represents capital of the company, goes to the corpus of the trust fund and not to the life tenant. McCracken v. Gulick, 92 N.J. Eq. 214.
Similarly it has also been determined that as to extraordinary dividends, where they represent in part earnings of the company prior to the commencement of the life estate and in part earnings made subsequent to the commencement of the life estate, such dividends are to be apportioned accordingly between the corpus
of the trust fund held for the remainderman and the income payable to the life tenant. Lang v. Lang's Executor, 57 N.J. Eq. 325.
Strictly this latter adjudication dealt with nothing other than extraordinary dividends. But, as was pointed out by Vice-Chancellor Bentley in Beattie v. Gedney, 99 N.J. Eq. 207
(at p. 210), the opinion contains a dictum of the clearest and strongest kind that the same principle should also apply to the case of ordinary dividends. This view has a strong inherent appeal to a court of equity, and since it has the sanction of such a dictum as the one referred to, it will be here determined that the rule is to be applied in the case of ordinary cash dividends as well as extraordinary cash dividends — and complainants will be so advised and instructed.
Of course, in some cases the particular language of the will or other instrument creating the terms of the trust, may be sufficient to determine the questions already considered as well as those hereinafter mentioned. Obviously it is always open to a testator to provide specifically in this behalf. In the instant case the language of the testator seems not sufficiently particular to afford any indication — the trustees are *Page 380 
directed to collect and receive "all the rents, issues, profits, dividends, interest, moneys and income arising" from the estate, and to pay over to the wife for life (or widowhood) "the whole net annual income thereof." The direction to divide "the whole capital of the said estate, real and personal * * * with all accumulations thereof," at the death of the wife, cannot be deemed an indication that the testator meant stock dividends to go into principal, especially when it is noted that the will was executed in 1891, when little if anything was known by anyone about such a thing as a stock dividend.
The next question is as to whether dividends declared after the death of a first life tenant, in the lifetime of a subsequent life tenant, shall be apportioned between the estate of the first life tenant and the succeeding life tenant. This seems to be resnova, in this state; but it is believed that its determination should be in accordance with the same principles governing the questions hereinbefore discussed.
When the gift of income to a life tenant or to successive life tenants, is in general language, and there is nothing to indicate a different intention, it would seem the fair interpretation to accord to the testator the intention that each life tenant should have as income such profits as were earned by the capital of the trust during the life tenancy; and this seems the fairest disposition from the point of equity. This would lead to the apportionment between the second life tenant and the estate of the first life tenant — of so much of any dividend declared after the death of the first life tenant as represented earnings — such apportionment to be in accordance with the share of the earnings earned in the respective lives of the two life tenants. And a similar rule would apply as between remainderman and the estate of a life tenant, where a dividend is declared after the death of the life tenant which represents in part earnings earned during the life of the life tenant.
The argument of convenience, which would give to the second life tenant (or to the remainderman) all of any dividend which was not declared in the lifetime of the (first) *Page 381 
life tenant, is effectually disapproved in the Lang Case,supra. It might also be argued that the testator's intent in giving the life income was for the maintenance of the life tenant during life, and that the opportunity to effectuate this purpose no longer exists after the death of the life tenant. But it cannot be assuredly known that the testator intended the gift as solely for life maintenance. And even if he did, it is fair to assume that he had in mind that the legatee would receive a fair and normal income at a normal rate covering the entire life period. If dividends were deferred or reduced, in whole or in part, until after the life tenant's death, this would curtail the life tenant's maintenance, even if the corporations had actually earned the money. But if the rule be that the life tenant's estate is entitled to the moneys earned when declared as dividends, even if after the life tenant's death — the life tenant might be able to ameliorate the unfortunate situation resulting from deferred or reduced dividends declared, by borrowing against his interest or share when it should be eventually declared.
Moreover there is another argument which would seem entitled to no inconsiderable weight. With the rule that the life tenant, or his estate, is entitled to the earnings made during his lifetime, even though not declared as dividends until after his death, all temptation or possibility of temptation to anyone to reduce or defer dividends for any other reason, or to any other extent, than the best interests of the corporation, will be entirely eliminated. It quite frequently happens that in these trust estates are shares of corporations which are or may be controlled in whole or in part by persons interested in the trust estate adversely to the interest of the life tenant.
The conclusion reached is that the basic rule should be, in cases of this kind, that dividends whether regular or extra-ordinary, should be divided or apportioned, and that the life tenant (or each successive life tenant) or his estate, is entitled to receive so much of such dividend, no matter when declared, as represents in fact earnings made during his lifetime, the balance going to the subsequent life tenant, or thecorpus of the trust, as the case may be. *Page 382 
This results in the instant case, in the determination that as to the stock dividend in question, declared subsequent to the death of the first life tenant, so much thereof as in fact represents capital, and so much thereof as represents earnings prior to testator's death, is to go to the corpus of the trust; so much thereof as represents earnings made by the corporations during the lifetime of the widow is to go to her executors; and so much thereof as represents earnings made by the corporations after the death of the widow is to be divided between the son and the daughter.
The apportionments are, naturally, to be made in accordance with the rules laid down in the Lang Case, supra, and in Day
v. Faulks, supra, and McCracken v. Gulick, supra.
The stock dividends themselves will not go to the life tenant but to the corpus; the interest of the life tenant (or life tenants) therein is to be computed and charged against thecorpus, to be satisfied, if necessary, by sale.
The new capital stock goes to corpus, subject to a charge in favor of the life tenant (or life tenants) of the amount of his or their money (share of earnings) used to pay for the stock, usually at the par value of the stock.
The date of the death of the testator must be regarded as the date when the stock of the subsidiary companies was actually acquired by the trustee, not the subsequent date when the stock of the subsidiary corporations was distributed by the parent company under the decree of the federal supreme court. Prior to the date of that distribution the shares of stock of the several subsidiaries were equitably in the corpus of the trust fund, albeit by means of an intermediate holder — the parent company — which must be regarded as a sort of subordinate or secondary trustee.
As to the exceptions to the disallowance of items in the account — these items were two payments, one of $1,651.94 (February 16th, 1926), and the other of $2,284.48 (April 23d 1926), both paid to Lybrand, Ross Montgomery, expert accountants.
The master finds and reports that complainants "were amply justified in engaging such accountants for the services *Page 383 
rendered by them, * * * and that such charges are reasonable," but disallows the items because of his belief that notwithstanding these findings, the allowance could not lawfully be made.
It is true that under ordinary circumstances the commissions allowed to a trustee or other accountant are intended to cover the work and expense of keeping his books and preparing his account, and that payments made by the trustee to bookkeepers, accountants or lawyers for performing these services which the trustee is supposed to perform for himself, cannot be allowed as items of discharge in his account. Wolfe's Case, 34 N.J. Eq. 223.
As is said in Kingsland v. Scudder, 36 N.J. Eq. 284,
"if the fiduciary chooses to employ others to do his work he must pay them himself."
What, however, is the fiduciary's work? Certainly work which is beyond the ordinary or reasonably to be expected skill and ability of such a fiduciary, cannot be deemed his work, and he will be entitled to obtain the skilled services of experts where necessary or advisable, and to have their compensation paid out of the estate; and indeed would probably be censurable, and perhaps personally liable, if he failed to do so.
It is on this basis that allowances are made for the services and advice of counsel. Such allowances will not be made where the services of counsel are not reasonably required — as for instance in the making up of the ordinary executor's or administrator's account; it does not take one skilled in legal matters to do that. On the other hand, what would be thought of a fiduciary, a layman entirely unversed in the law, who attempted to carry on himself, unaided by a lawyer, a complicated litigation involving the interests of the estate? Or suppose an ordinary business man appointed a testamentary guardian with directions to educate the ward along certain specialized and technical lines. Naturally the guardian would be allowed reasonable disbursements for the payment of teachers in such subjects; he would not be expected to do the teaching himself or at his own expense. *Page 384 
There may be, therefore, I take it, matters involved in the computation and distribution of income and capital by trustees and in the statement and rendering of their accounts, in unusual and complicated cases, which are beyond the reasonable expectation of the skill and ability of the ordinary fiduciary, in which his employment of an expert — a combination of lawyer and accountant trained in such matters — will be not only justifiable but commendable and even necessary, and for whose compensation allowance may, and should, be made from the estate.
Such, it seems clear, both from the evidence and the finding of the master who heard the testimony, was the situation in the instant case. The complicated work, the legal questions involved, the necessity for skilled knowledge in the matters of apportionment of dividends between capital and income, of apportionment of subsequent earnings or dividends in stock acquired through stock dividends, of making proper income tax returns and payments, and apportioning the same, and the like, all indicate the reasonableness and the propriety of having these things done or supervised by persons skilled along those lines, and that the skill and ability to do these things properly and for the best interests of the estate is not reasonably to be expected of the fiduciary himself.
It is perhaps within the skill and ability of the average wage earner or salaried man to make up his income tax return; but on the other hand it is a matter of common knowledge that those in charge of large and complicated business organizations require the services of experts in this line, and by utilizing such services save themselves large sums.
Each case obviously must depend on its own circumstances; and the test must be that of reasonableness. In the present instance the reasonableness of the expenditure and the propriety of allowing it as a charge against the estate, seem beyond question, and the exceptions will be sustained. The master's disallowance, and the defendant's argument in support of such disallowance, were both obviously based on the *Page 385 
belief that under no circumstances could such an allowance legally be made.
It is, of course, in no wise intended to open the door to unjustifiable claims for allowance in such matters. The burden of proof will always be upon the fiduciary to establish to the satisfaction of the court that such allowance should be made. *Page 386